**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

In re

DANA CORPORATION,

                     Debtor-Appellee,

        and                                         Case No. 07-cv-11144 (LAK)

JASCO TOOLS, INC.,

                     Claimant-Appellant.
_____

## APPELLANT'S BRIEF OF JASCO TOOLS, INC.

Alexander Geiger, Esq. (AG-8974)
GEIGER and ROTHENBERG, LLP
45 Exchange Street, Suite 800
Rochester, NY  14614
Tel.:  (585) 232-1946
Fax.:  (585) 232-4746

*Attorneys for Claimant-Appellant Jasco Tools, Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...........................................................................................iii

RULE 7.1 STATEMENT ..............................................................................................1

JURISDICTIONAL STATEMENT ...............................................................................1

QUESTIONS PRESENTED...........................................................................................1

STATEMENT OF THE CASE........................................................................................3

STATEMENT OF FACTS ..............................................................................................4

    Background.....................................................................................................4

    Proceedings in Bankruptcy Court.....................................................................5

    Evidence Raising Genuine Issues of Material Fact Concerning
        Defendants' Wrongdoing .........................................................................6

    Evidence Specifically Relating to Dana ..........................................................12

STANDARD OF REVIEW ...........................................................................................16

ARGUMENT

BANKRUPTCY COURT ERRED IN GRANTING SUMMARY
JUDGMENT IN FAVOR OF DANA.............................................................................16

    Point I:  Dana's "Objection" was Not the Procedural Equivalent of a
        Summary Judgment Motion .....................................................................17

    Point II:  Bankruptcy Court Deprived Jasco of its Elementary Due
        Process Rights .........................................................................................19

    Point III:  Dana's Summary Judgment Motion should have been
        Denied, because Discovery was Not Yet Complete.....................................19

    Point IV:  Dana Failed to Make Out a Prima Facie Entitlement to
        Summary Judgment...................................................................................21

    Point V:  Dana's Summary Judgment Motion should have been Denied,
        because there were Genuine Issue of Material Fact raised by the
        Motion Papers..........................................................................................22

A.  Breach of Contract Cause of Action ........................................................................22

B.  Conversion Cause of Action .................................................................................27

C.  Unjust Enrichment Cause of Action ....................................................................28

D.  Prima Facie Tort Cause of Action........................................................................29

CONCLUSION...............................................................................................................31

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505 (1986)...................................22

Arbitron, Inc. v. Tralyn Broadcasting, Inc., 400 F.3d 130 (2nd Cir. 2005)............................25

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986) ...............................................21, 22

Colavito v. New York Organ Donor Network, Inc., 8 N.Y.3d 43, 860
    N.E.2d 713 (2006) .........................................................................................................28

Concrete Designers, Inc. v. Demmler, 1995 WL 765170 (Ohio App. 1995) ...........................24

Curiano v. Suozzi, 63 N.Y.2d 113, 469 N.E.2d 1324 (1984) ...................................................30

Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775 (2nd Cir. 2003)................................22

Dalton v. Educational Testing Service, 87 N.Y.2d 384, 663 N.E.2d 289
    (1995).............................................................................................................................24

Dunina v. Lifecare Hospitals of Dayton, 2006 WL 1529475 (Ohio App.
    2006)..............................................................................................................................24

DVCC, Inc. v. Medical College of Ohio, 2006 WL 496036 (Ohio App.
    2006)..............................................................................................................................24

In re Adler, Coleman Clearing Corp., 263 B.R. 406 (S.D.N.Y. 2001) ....................................16

In re AroChem Corp., 176 F.3d 610 (2d Cir. 1999) .................................................................16

In re United States Lines, Inc., 197 F.3d 631 (2d Cir. 1999)....................................................16

Jasco Tools, Inc. v. Rogers, ___ A.D.2d ___, 844 N.Y.S.2d 810 (4th Dep't,
    Nov. 9, 2007) ................................................................................................................21

Littlejohn v. Parrish, 163 Ohio App.3d 456 (Ohio App. 2005).................................................24

May Metropolitan Corporation v. May Oil Burner Corporation, 290 N.Y.
    260, 49 N.E.2d 13 (1943) .............................................................................................25

Meloff v. New York Life Ins. Co., 51 F.3d 372 (2d Cir. 1995) .................................................21

O'Shanter Resources, Inc. v. Niagara Mohawk Power Corp., 915 F.Supp.
    560 (WDNY1996) .........................................................................................................23

Paramount Film Distributing Corp. v. State of New York, 30 N.Y.2d 415,
   285 N.E.2d 695 (1972), cert. denied 414 U.S. 829, 94 S.Ct. 57.........................................29

Ritter v. Fairwary Park Properties, LLC, 2004 WL 1104015 (Ohio App.
   2004).........................................................................................................................................24

Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc., 487 F.3d
   89 (2nd Cir. 2007)...................................................................................................................25

## RULE 7.1 STATEMENT

Claimant-Appellant, Jasco Tools, Inc. ("Jasco"), is a closely held corporation.  It does not have any parent corporation, nor does any publicly held corporation own 10% or more of its stock.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction of the instant appeal pursuant to 28 U.S.C. § 158(a).

## QUESTIONS PRESENTED

1.    Did the Bankruptcy Court err in granting the request of Debtor-Appellee Dana Corporation ("Dana"), over Jasco's timely objection, to consider the Objection of Debtors and Debtors in Possession Seeking to Disallow Claims of Jasco Tools, Inc. ("Objection") as the equivalent of a summary judgment motion, despite the procedural deficiencies of the Objection as a summary judgment motion?

2.    Did the Bankruptcy Court err in considering Dana's Objection as the equivalent of a summary judgment motion, despite the lack of any proof, in evidentiary form, submitted in support of the motion?

3.    Did the Bankruptcy Court err in granting the request of Dana, over Jasco's timely objection, to consider Jasco's Response to Dana's Objection ("Response") as Jasco's response to Dana's putative summary judgment motion, despite the fact that Jasco submitted its Response prior to receiving any notice that either Dana or the Court intended to consider the Objection to be the equivalent of a summary judgment motion?

4.    Did the Bankruptcy Court err in requiring Jasco to submit its response to Dana's Rule 7056-1 Statement before actually seeing Dana's Rule 7056-1 Statement?

5.    Did the Bankruptcy Court err in stating, at the Initial Status Conference, that it was prepared to rule on Dana's summary judgment motion, on the merits, before setting a briefing schedule for the motion, before receiving all of the motion papers in connection

with the motion, and before hearing the argument of counsel in connection with the motion?

6.      Did the Bankruptcy Court err in dismissing Jasco's need for additional discovery, and in ignoring Jasco's pending document request, served prior to the filing of Dana's bankruptcy petition, without any consideration of the actual contents of the pending document request?

7.      Did the Bankruptcy Court err in relying on the language of a state court trial judge, ruling on the summary judgment motion of another defendant sued by Jasco, where the decision of the state court trial judge was subsequently reversed on appeal?

8.      Did the Bankruptcy Court err in granting summary judgment to Dana, without considering the requirement of Rule 56(f) of the Federal Rules of Civil Procedure, and despite the fact that Jasco was deprived of the opportunity to present facts necessary to oppose Dana's summary judgment motion by Dana's refusal to disclose requested documents?

9.      Did the Bankruptcy Court err in granting summary judgment to Dana, upon the first cause of action alleged by Jasco against Dana in the underlying state court action, stating a claim for breach of contract, despite the existence of numerous genuine issues of material fact in connection with said cause of action?

10.     Did the Bankruptcy Court err in granting summary judgment to Dana, upon the second cause of action alleged by Jasco against Dana in the underlying state court action, stating a claim for conversion, despite the existence of numerous genuine issues of material fact in connection with said cause of action?

11.     Did the Bankruptcy Court err in granting summary judgment to Dana, upon the third cause of action alleged by Jasco against Dana in the underlying state court action, stating a claim for unjust enrichment, despite the existence of numerous genuine issues of material fact in connection with said cause of action?

12.     Did the Bankruptcy Court err in granting summary judgment to Dana, upon the fourth cause of action alleged by Jasco against Dana in the underlying state court action, stating a claim for *prima facie* tort, despite the existence of numerous genuine issues of material fact in connection with said cause of action?

13.     Did the Bankruptcy Court err in disallowing and expunging Jasco's Claim Number 9592, in the amount of $20,000,000, out-of-hand, without giving Jasco a hearing, without even considering that additional discovery had been requested, and was need, by Jasco, without even considering the requirements of Rule 56(f) of the Federal Rules of Civil Procedure, and despite the existence of numerous genuine issues of material fact in connection with each cause of action alleged by Jasco in the underlying state court action?

## STATEMENT OF THE CASE

Jasco filed a timely Proof of Claim, in the amount of $20,000,000, in a bankruptcy proceeding commenced in the Bankruptcy Court, by Dana and related companies.  (R. 32–33)[1] In due course, Dana filed an Objection (R. 68–357), serving notice that it intended to ask the Bankruptcy Court to expunge Jasco's Proof of Claim.  Jasco responded to the Objection (R. 358–503), and also moved for mandatory abstention and a lifting of the automatic bankruptcy stay. (R. 668– 682)  In a Memorandum Decision (R. 14–28), subsequently reduced to an Order (R. 29–31), the Bankruptcy Court denied Jasco's motion for mandatory abstention and a lifting of the automatic stay, overruled Jasco's procedural objections, and granted summary judgment to Dana, expunging Jasco's Claim.  (R. 31)  Jasco then filed a timely Notice of Appeal (R. 1–3), resulting in the instant proceeding.

---

[1] All page references, in the form R. ___ , are to the courtesy copy of the Record on Appeal, furnished to this Court, with a copy provided to opposing counsel.

## STATEMENT OF FACTS

All of the facts set forth herein are taken from the Declaration of Eugene W. Baldino, dated September 19, 2007, and submitted to the Bankruptcy Court in connection with this proceeding. (R. 373–503)  Mr. Baldino is the CEO of Jasco.  (Baldino Declaration, par. 1, R. 373)

### *Background*

As set forth by Mr. Baldino, Jasco is a contract precision machining company headquartered in Rochester, New York.  (Baldino Declaration, par. 3, R. 374)  Dana was a very important customer of Jasco's.  The annual volume of business between Jasco and Dana, pursuant to a written Purchase Agreement (R. 389-399), was approximately $24 million. (Baldino Declaration, par. 4, R. 374)

Pursuant to the terms of the Purchase Agreement, Jasco and Dana had agreed to negotiate a five-year extension of the Purchase Agreement, i.e., an extension up to December 31, 2005. (*See* paragraph 4.01 of the Purchase Agreement, R. 392)

Until the summer of 1999, three employees of Jasco constituted the "Dana Team" at Jasco:  Gary Rogers, Charles Zicari, and Sean Convertino.  Rogers served as president of Jasco until he left, effective May 31, 1999.  Zicari was a regional sales manager, responsible for the Dana account, until July 9, 1999.  Convertino was an engineering and quality assurance manager, responsible for the Dana account, until July 16, 1999.  Together, these three employees were responsible for all aspects of the contract between Jasco and Dana.  (Baldino Declaration, par. 6, R. 374)

After his departure from Jasco, Rogers became a self-employed businessman.  Both Zicari and Convertino accepted employment, in August of 1999, at Nationwide Precision Products Corp. ("Nationwide"), one of Jasco's competitors in Rochester, New York.  (Baldino Declaration, par. 7, R. 374)

Jasco subsequently discovered that, prior to their departure from Jasco, the "Dana Team" was devoting its efforts to diverting various business opportunities from Jasco.  In addition, Jasco

discovered that, when they left their employment with Jasco, the "Dana Team" took with them numerous documents and computer files containing Jasco's trade secrets and business confidential information to aid them in their efforts to divert Jasco's business opportunities. (Baldino Declaration, par. 8, R. 375)

Unbeknownst to Jasco, in 1999, at the time when Dana was supposedly considering the five-year extension of the Purchase Agreement with Jasco, Dana was in fact working with Jasco's "Dana Team" to divert the contract from Jasco to Nationwide.  Dana's apparent motivation was to obtain the benefit of Jasco's trade secrets, which Jasco had developed over time and at great expense, without paying for them, by having the Jasco "Dana Team" steal these trade secrets and transfer them to Nationwide, and then letting Nationwide utilize them, with the result that Nationwide, having spared itself the cost of developing these trade secrets, could undercut Jasco's prices.  (Baldino Declaration, par. 9, R. 375)

At the end of 1999, Dana, not surprisingly, failed to renew the Purchase Agreement with Jasco, and transferred the work to Nationwide, causing substantial damages to Jasco.  In due course, Jasco commenced legal action against Rogers, Zicari, Convertino, Nationwide and Dana in New York State Supreme Court.[2]  (Baldino Declaration, par. 10, R. 375)

### Proceedings in Bankruptcy Court

On March 3, 2006, Dana and related companies filed a bankruptcy petition in the Bankruptcy Court. (R. 71) Jasco filed a timely Proof of Claim on September 18, 2006. (R. 32) The Bankruptcy Court established a procedure pursuant to which Dana could challenge the validity of claims asserted against the bankruptcy estate. (R. 38–62)

On August 31, 2007, Dana served upon Jasco a document entitled "Notice of Objection," in which Dana advised Jasco that: "If you file a timely Response, an initial status conference (the "Initial Status Conference") with respect to the Objection will be held on October 17, 2007 at 10:00 am …." (R. 65)

Jasco served and filed its Response on September 21, 2007 (R. 358–503)

---

[2] The case has been settled with Convertino, Zicari, and Nationwide.  The case against Rogers is currently pending in New York Supreme Court.  The claim against Dana was stayed upon Dana's filing of its bankruptcy petition.

It was only during the required "meet and confer" conference with opposing counsel, held on September 28, 2007, one week *after* service of the Jasco Response, that Jasco was advised for the first time by opposing counsel that there was no need to discuss any scheduling, because Dana intended to "convert" its Objection into a summary judgment motion and to argue the motion on the merits at the Initial Status Conference on October 17, 2007. (R. 549–550)

Despite Jasco's immediate, vigorous, and written protest to the Bankruptcy Court about this bait and switch procedure by Dana (R. 547–551), the Bankruptcy Court condoned Dana's "conversion" of its Objection, gave Dana an additional week to submit the required Rule 56.1 Statement, and ordered the parties to return in two weeks to argue the non-existent summary judgment motion. (R. 643–650) When counsel for Jasco requested an opportunity to respond to Dana's Rule 56.1 Statement, as provided for in Local Rule 56.1 and Local Bankruptcy Rule 7056-1, the Bankruptcy Court ordered Jasco to submit its response simultaneously with Dana's statement, thus making it impossible for Jasco actually to respond to Dana's statement. (R. 648–649) Furthermore, the Bankruptcy Court ordered Jasco to serve and file any cross-motions that it wished to bring and any additional summary judgment motion papers within one week, and it ordered that the "summary judgment motion" and any other motions would be argued on the merits two weeks after the Initial Status Conference. (R. 643–650)

In short, the Objection filed by Dana in this matter was not a motion for summary judgment, yet it was unilaterally converted by Dana, with the approval of the Bankruptcy Court, into such a motion, under circumstances that deprived Jasco of any meaningful opportunity to submit any responsive papers in opposition to such a summary judgment motion.

### Evidence Raising Genuine Issues of Material Fact Concerning Defendants' Wrongdoing

In the course of discovery in the state court action, Jasco has amassed a substantial amount of evidence proving its claims against each of the defendants. This evidence shows, among other things, that Rogers and Zicari contacted purchasing agents at various Jasco customers, including Dana, in an effort to persuade these customers to move their business, that Rogers took numerous confidential documents when he left Jasco, and that Convertino downloaded thousands of pages of technical details from his computer at Jasco, which data he took with him upon his departure from Jasco. The evidence also shows that Rogers, Zicari, and

Convertino then worked with Dana and Nationwide to divert the Dana business from Jasco to Nationwide. (Baldino Declaration, par. 11, R. 375)

Zicari and Convertino became employees of Nationwide within one week of each other, in August of 1999, shortly after leaving Jasco. Rogers, who was precluded from open participation in this scheme, because of his Termination Agreement with Jasco, continued to help behind the scenes. (Baldino Declaration, par. 12, R. 376)

There were numerous contacts between and among Rogers, Zicari, and the purchasing people at Dana (Paul Blanchard, a Director of Materials and Procurement at Dana; Adam Haybach, a Purchasing Manager at Dana; and Bob Buss, a Purchasing Product Analyst at Dana) throughout June, July, and August of 1999.[3] According to the deposition testimony of Jeff Nuccitelli, Vice President of Sales at Nationwide, in August of 1999, Zicari advised him that there was "an opportunity" at Dana. (Nuccitelli deposition transcript, pp. 104, 109-110, R. 401-403)

Thereafter, on September 30, 1999, Haybach sent an email message to Buss, telling him to: "Please pull a print/quote package for all Jasco parts for Nationwide/Zicari (long term up to 5 years). He's verbally committed to a 10% price reduction from Jasco's 1/1/2000 pricing . . . ." (R. 405) Then, on October 19, 1999, a team of Dana employees, including Haybach and Buss, were hosted for dinner by Nationwide in Rochester, New York, and on October 20, 1999, the Dana people toured the Nationwide facilities in Rochester, New York. (R. 407)

Dana invited the Nationwide sales team to make a formal presentation to Dana in Kalamazoo, Michigan, hosted them for dinner on November 9, 1999 (R. 408), and received the formal presentation on November 10, 1999, at the Dana offices in Kalamazoo, Michigan. (R. 410-426) Finally, on November 26, 1999, Dana received a detailed, written quote from Nationwide. (R. 428-433)

Remarkably, this written quote, dealing with some 130 different parts, managed to undercut Jasco's price *on each part* by precisely ten percent, even though the Dana purchasing

---

[3] Jasco has obtained telephone records showing dozens of phone calls between and among Rogers, Zicari, Haybach, and Buss throughout June, July, and August of 1999.

people admitted at their depositions that it would have been unethical for them to disclose the Jasco prices to a competitor, and even though they claimed that they had never disclosed these prices to Nationwide prior to receiving the Nationwide quote. (Haybach deposition transcript, pp. 457, 493-494, R. 435-437; Buss deposition transcript, p. 70, R. 439)

It was only after Dana had secured the detailed, written Nationwide quote that Dana sat down for the first time, on December 3, 1999, to engage in the contractually required "good faith" negotiations with Jasco concerning extension of the Purchase Agreement. (Baldino Declaration, par. 17, R. 377)

Mr. Baldino was the individual representing Jasco at the December 3 meeting. In his Declaration, he stated unequivocally that there were absolutely no negotiations that took place at that meeting. Mr. Baldino presented Jasco's proposal for the renewal period, which sought modest increases over the life of the extension term. In response, Adam Haybach simply told him that Dana was looking for a price reduction, and that unless Jasco cut its prices across the board, they had nothing to talk about. The next thing Jasco heard from Dana was a phone call, on or about December 20, 1999, telling them that Dana had decided not to renew the Purchase Agreement with Jasco. (Baldino Declaration, par. 18, R. 377)

Later, Jasco found out that, of the thousands of companies to which Dana could have turned, for some mysterious reason they chose Jasco's competitor down the road in Rochester, New York, which competitor had almost no prior experience machining these types of cast iron parts. This choice by Dana was particularly inexplicable, because Dana could have chosen a supplier not only in the United States, but in any one of a number of low-cost countries around the world. If Dana felt strongly that it wanted a United States supplier, then it could have chosen a supplier much closer to its casting plants and its assembly plants, which are located primarily in Wisconsin and Kentucky, respectively, thereby saving millions of dollars in transportation costs over the life of the contract. There is only one plausible reason for Dana's choosing Nationwide, which is the fact that Nationwide had acquired (free of charge) all of the trade secrets that Jasco had developed over the prior years of the contract, and Dana wanted both a lower price and the benefit of Jasco's trade secrets. (Baldino Declaration, par. 19, R. 377)

In the course of discovery in the state court action, Jasco uncovered documentary evidence of the defendants' wrongful activities.  For example, Jasco obtained a copy of the computer disk taken by Convertino, which contained some 4000 pages of technical details about Jasco's manufacturing processes with respect to the Dana parts.  (Baldino Declaration, par. 20, R. 378)

In addition, Jasco obtained a copy of Nationwide's PowerPoint presentation to Dana, on November 10, 1999, attended by Convertino and Zicari, during which Nationwide bragged that: "NPP [Nationwide] has assessed [sic] this program with employees who have been *intimately knowledgeable* with this program.  Estimates of current machining cycles (costs) were based on review of representative prints *as well as past experience with program*" (Emphasis added).  (A copy of the PowerPoint presentation is at R. 410- 426; the quotation in question appears at R. 419)

In addition, Jasco obtained a copy of an internal Nationwide memorandum, in which the president of Nationwide (Ron Ricotta) is reporting to his board of directors about the effort to transfer the Dana contract from Jasco to Nationwide.  Mr. Ricotta states:  "Once again Nationwide has two engineers that it currently employs that assisted in engineering and monitoring this work when it was at the other supplier [i.e. Jasco]."  "We have not attached the detail part by part at this time, but do have that in-house at Nationwide.  We are somewhat concerned about transmitting this data outside the four walls of Nationwide."  ( R. 445-446)

In addition, Jasco obtained a copy of Nationwide's internal program analysis of the Dana Program, dated February 1, 2000, which states:  "Nationwide has personnel including three individuals (two engineers and one salesman) that were intimately involved in the program at the former supplier [Jasco].  Sean Convertino, one of the engineers, was program manager.  His knowledge base includes:  Part Knowledge; Cycle Time; Inherent ease and/or difficulties associated with parts; Cell and machine set up since he engineered program at former supplier; Direct customer contact for all customer needs including technical support and quoting new programs." (R. 450)

In addition, Jasco obtained a copy of Nationwide's actual proposal to Dana, dated November 26, 1999.  This is a detailed, part-by-part proposal.  Remarkably, Nationwide

managed to undercut Jasco's price on *every part by exactly 10 percent.*  (R. 428-433)  It is important to remember that Nationwide, as Jasco's competitor, was not supposed to know the prices that Jasco was intending to charge.

Finally, Jasco also obtained a copy of Convertino's performance review at Nationwide, dated February 29, 2000, where he was given a $20,000.00 bonus, and promised another $22,000.00 bonus, "for the securing of the Dana Contract." ( R. 469)

During his deposition, Convertino testified that:  "The data [that he took from Jasco] could be helpful.  A lot of the spreadsheets were things I had created that were pretty intricate, that were very helpful in estimating manufacturing processes.  A lot of them contained speed and feed calculations for moving materials, whether they be aluminum, cast iron and such.  And I knew if I was going to stay in the field, I could use that." (Convertino deposition transcript, pp. 44-45, R. 471-472)

He also testified that as follows:

> Q.  Based on your own knowledge and expertise in this field, was that information helpful for somebody who wanted to compete with Jasco?
>
> A.  Yes.
>
> Q.  Why?
>
> A.  It contained all of the financials and manufacturing process outlines.
>
> (Convertino deposition transcript, pp. 88-89, R. 473-474)

He also testified that:  "The information as to the exact cycle time that it took Jasco to produce a part, yes, I would have to agree with you that that would be proprietary.  As a manufacturing engineer, looking at the part, going through calculations of speeds, feeds, types of cuts, available machinery to produce that said part, I could come up with an estimated cycle time very similar to that number."  "The document was an Excel spreadsheet that was very helpful for any manufacturing engineer in estimating cost of any part produced on any machine.  I spent a lot of time developing it and expected to put it to good use in my venture with Chuck Zicari at National Machine." (Convertino deposition transcript, p. 157, R. 475)

Convertino also testified that as follows:

> Q.  And in making these estimates for Nationwide, you had the benefit of the learning curve, as you mention, that occurred at Jasco over a period of years.
>
> MR. LIPSON:  Form
>
> Q.  Correct?
>
> A.  Most definitely.
>
> (Convertino deposition transcript, p. 258, R. 476)

Convertino also testified that as follows:

> Q.  Now, did Messrs. Ricotta and Nuccitelli [President and VP of Nationwide, respectively] understand that you were giving them proprietary information belonging to Jasco?
>
> MR. LIPSON:  Form
>
> A.  They were very concerned whether or not I had signed a no-compete clause or confidentiality agreement.
>
> Q.  Again, the question is, were they aware that you were providing to them proprietary information that you had taken from Jasco?
>
> MR. LIPSON:  Form
>
> A.  They knew that I was using my experience as a basis of coming up with estimates for them.
>
> Q.  Did they know that you had actual documents that you had taken from Jasco?
>
> A.  I would have to say yes, because I provided them with the cost breakdown and quantities that I faxed to Chuck Zicari.  I couldn't have had those without taking documents from Jasco.
>
> (Convertino deposition transcript, pp. 290-91, R. 477-478)

Telephone records that Jasco obtained from various telephone companies are particularly enlightening.  As laid out by Mr. Baldino in his Declaration, the pattern on these telephone calls among the defendants makes it clear that the former Jasco employees conspired with the Dana employees to transfer the Dana business from Jasco to Nationwide.  (Baldino Declaration, pars. 31-40, R. 381-383)

*Evidence Specifically Relating to Dana*

Of all of the defendants in the state court action, Dana has been the least forthcoming during the discovery process. First, Dana employees submitted a number of affidavits to the state court that subsequent testimony and documentation has proven to be perjured. For example, Paul Blanchard, formerly a Director of Materials and Procurement at Dana, submitted an affidavit, sworn to on October 3, 2001, in which he stated: "I understand that both Mr. Convertino and Mr. Zacari [sic] left their employment with Jasco in 1999. I had no further dealings with these defendants concerning the contract negotiations with Jasco after they left Jasco." (*See* Blanchard Affidavit, par. 3, R. 480)

In fact, subsequent discovery in the state court action has shown that Mr. Blanchard had dinner with Messrs. Convertino and Zicari on November 9, 1999, in conjunction with Dana's efforts to switch the contract to Nationwide; that Mr. Blanchard was present on November 10, 1999, during the formal presentation by Nationwide to Dana in Kalamazoo, Michigan, during which Messrs. Convertino and Zicari were two of the presenters, and during which Nationwide made clear to Dana the extent of the stolen Jasco information in its possession; that Mr. Blanchard probably had toured the Nationwide facility in Rochester, New York, on October 20, 1999, while accompanied, among others, by Messrs. Convertino and Zicari; and that Mr. Blanchard was intimately involved in the entire process whereby the Purchase Agreement was switched from Jasco to Nationwide. Therefore, Mr. Blanchard's sworn statement that he had "no further dealings" with Messrs. Convertino and Zicari after they left Jasco was false. (Baldino Declaration, par. 44, R. 382-383)

Similarly, Mr. Blanchard, in his affidavit, stated: "During the contract negotiations with Mr. Baldino, Jasco requested an unacceptable price increase for the contract extension which caused Dana to investigate other sources to provide the necessary work. During that search, Dana received a favorable response from Nationwide for the same services previously provided by Jasco." (*See* Blanchard Affidavit, par. 5, R. 481)

In fact, there were no contract negotiations between Jasco and Dana. There was only the meeting of December 3, 1999, during which Mr. Baldino presented Jasco's proposal to Dana, which Dana refused to discuss, much less negotiate. However, more importantly, in his

affidavit, Mr. Blanchard attempted to mislead the state court by claiming that it was Jasco's proposal which caused Dana to begin its search for another supplier. In fact, the meeting between Jasco and Dana took place on December 3, 1999. Subsequent discovery has shown that Dana purchasing people were having telephone discussion with Rogers and Zicari in June, July, and August, 1999; that Haybach told Buss to "pull a print/quote package for all Jasco parts" on September 30, 1999; that employees of Dana had dinner with Nationwide employees in Rochester, New York, on October 19, 1999; that Dana employees visited the Nationwide facility in Rochester, New York, on October 20, 1999; that Dana employees had dinner with Nationwide employees in Kalamazoo, Michigan, on November 9, 1999; that representatives of Dana (including Mr. Blanchard) and representatives of Nationwide (including Messrs. Zicari and Convertino) met for a formal presentation at the Dana offices in Kalamazoo on November 10, 1999; and that Dana had in hand a detailed written quote from Nationwide on November 26, 1999, *before* Dana ever sat down with Jasco on December 3, 1999. Therefore, the statement by Mr. Blanchard that it was the proposal presented by Mr. Baldino on December 3, 1999, which caused Dana to begin its search for another supplier was false. (Baldino Declaration, par. 46, R. 383)

Similarly, Adam Haybach, formerly a Purchasing Manager at Dana, submitted an affidavit to the state court, sworn to on January 4, 2002, in which he stated: "… on December 3, 1999, Bob Buss and I met with Mr. Baldino to attempt to negotiate a renewal of the contract. That meeting took place at Dana's offices in Kalamazoo, Michigan. . . . . Because this was one of Dana's largest contracts with an outside supplier, upon receiving Mr. Baldino's response, I sought potential new suppliers to begin work upon expiration of the Dana/Jasco contract in January 2001. In that regard, Dana contacted Nationwide Precision Products Corp. ("Nationwide") to inquire as to its capabilities to perform the needed work." (*See* Haybach affidavit, pars. 8, 13, and 14, R. 485)

Again, as discussed above, Mr. Haybach attempted to mislead the state court by claiming that it was only after his meeting with Mr. Baldino, on December 3, 1999, that Dana commenced its search for another supplier. This statement by Mr. Haybach was false. (Baldino Declaration, par. 48, R. 384)

There are a number of other false and misleading statements contained in the affidavits submitted by Messrs. Blanchard and Haybach, and there is also a reply affidavit by Mr. Blanchard that is similarly false and misleading; however, the above examples are sufficient to illustrate the point.  The Dana people knew perfectly well that what they had done was wrong, which is why they submitted perjured affidavits to the state court, hoping to conceal their wrongdoing.  (Baldino Declaration, par. 49, R. 384)

Second, it is clear that Dana employees knew that they were receiving a bid from Nationwide that was based on stolen information. Nationwide actually bragged to Dana about the extent of the information that they had stolen from Jasco.  The PowerPoint presentation by Nationwide to Dana on November 10, 1999, shows that Nationwide specifically discussed with Dana the technical information that they had stolen from Jasco.  In addition, not only did Nationwide promise to Dana a ten percent price cut from Jasco's projected 2000 prices, they actually managed to deliver to Dana, on November 26, 1999, a detailed written quote, in which they managed to undercut the price that Jasco was planning to charge Dana in 2000 by exactly ten percent for each one of some 130 different parts.  Dana has consistently denied that it provided the Jasco prices to Nationwide.  Therefore, the only way that Nationwide could have obtained the exact price intended to be charged by Jasco for each part was by stealing this information from Jasco.  (Baldino Declaration, par. 50, R. 384)

Third, the Dana witnesses were singularly forgetful in their deposition testimony.  For example, when asked about his lengthy conversations with Rogers, Bob Buss testified as follows:

> Q.  Now, after Mr. Rogers left Jasco did you have any further conversations with him?
>
> A.  No.
>
> Q.  Either in person or by telephone?
>
> A.  No.
>
> Q.  Do you remember getting a call from Mr. Rogers on June 4, at 1:31 p.m.?
>
> A.  I don't recall that, no.

Q.  Just to check here, the phone number I have here is 616-553-1940.  Is that your phone number, or was that your phone number?

A.  I believe it was.

Q.  When I say your number, that was your office number?

A.  My desk number, yes.

Q.  In Kalamazoo?

A.  Yes.

Q.  Now, how about June 7th, do you recall getting a call June 7, 1999, at 4:38 p.m.?

A.  No.

Q.  According to Mr. Rogers's telephone records, he talked to you for 30 minutes that day.  Do you remember talking to Mr. Rogers for 30 minutes--

A.  No, I do not.

Q.  --in June of 1999?

A.  I do not recall ever talking to Mr. Rogers for any extended period of time on the phone.

****

Q.  How about August 9, 1999?  Do you recall getting a short call from Mr. Rogers on that day?

A.  No.

Q.  Now, on August 12, 1999, 11:03 a.m., Mr. Rogers's telephone records show another phone call from his office to your phone number of 25 minutes' duration. Do you recall talking to Mr. Rogers for 25 minutes on August 12, 1999?

A.  No.

(*See* Buss deposition transcript, pp. 88-89, 91-92, R. 440-443)

Fourth, Dana has stonewalled Jasco's discovery demands.  At the time of Dana's bankruptcy filing, there was outstanding a document demand directed to Dana in response to which Dana had failed to provide any documents.  Given the tendency of Dana employees to lie under oath, as demonstrated by their affidavits, and given their forgetfulness, as demonstrated at

- 15 -

their depositions, it is absolutely vital to obtain Dana's paper and electronic records to demonstrate what actually happened. (Baldino Declaration, par. 52, R. 386)

Finally, as shown in Mr. Baldino's Declaration, Dana absolutely refused to engage in any good faith negotiations with Jasco, on December 3, 1999, or at any other time, concerning the extension of the Purchase Agreement, as required by the contract. Instead, knowing that Nationwide was using Jasco's stolen information, they opted to take advantage of this stolen information by "splitting" the proceeds of this theft, with Nationwide getting Jasco's contract and Dana getting a ten percent discount on its prices. (Baldino Declaration, par. 53, R. 386)

## STANDARD OF REVIEW

A district court's jurisdiction to review appeals from bankruptcy court orders is governed by 28 U.S.C. § 158(a), which grants jurisdiction for a district court to hear an appeal from a bankruptcy court's final judgment, order or decree. When reviewing an appeal from a bankruptcy court's final order, the district court reviews the bankruptcy court's findings of fact for clear error. *See, e.g., In re Adler, Coleman Clearing Corp.,* 263 B.R. 406, 423 (S.D.N.Y. 2001). By contrast, a *de novo* standard of review applies to questions of law. *See, e.g., In re AroChem Corp.,* 176 F.3d 610, 620 (2d Cir. 1999). With respect to mixed questions of law and fact, the Court must review findings of fact under the clearly erroneous standard and the conclusions of law *de novo*. *In re United States Lines, Inc.,* 197 F.3d 631, 640-41 (2d Cir. 1999).

## ARGUMENT

### BANKRUPTCY COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DANA

There are numerous procedural and substantive reasons why the Bankruptcy Court should have denied Dana's summary judgment motion. Among the procedural deficiencies was the failure of Dana actually to serve a summary judgment motion and the failure of the Bankruptcy Court to adhere to the procedural requirements of the Federal Rules of Civil Procedure, the Local Rules in effect in this District and in the Bankruptcy Court, and the

Bankruptcy Court's own procedures, adopted by the Bankruptcy Court for this very case. As a result, Jasco was deprived of its elementary due process rights.

Furthermore, Dana's summary judgment motion should have been denied, because discovery was not yet complete. In addition, Dana failed to carry its burden of showing a *prima facie* entitlement to summary judgment in its motion papers. Finally, as a substantive matter, Dana's summary judgment motion should have been denied, because there were genuine issues of material fact raised by the motion papers.

### Point I: Dana's "Objection" was Not the Procedural Equivalent of a Summary Judgment Motion

At no time during this proceeding has Dana served upon Jasco either a "Notice of Motion" or a "Motion" seeking summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure or Rule 7056 of the Federal Rules of Bankruptcy Procedure.[4] Instead, Dana served upon Jasco a document entitled "Notice of Objection," in which Dana advised Jasco that: "If you file a timely Response, an initial status conference (the "Initial Status Conference") with respect to the Objection will be held on October 17, 2007 at 10:00 am …" (R. 65) This Notice of Objection also advised Jasco that the Response was supposed to contain: "A *concise statement* setting forth the reasons why the Court should not sustain the Objection ..." and "a statement, *on a preliminary basis*, of the nature of any evidence the Claimant anticipates presenting …" (R. 66) (emphasis added). Furthermore, on the front page of the Notice of Objection, on the front page of the Objection itself, and on the front page of the Reply served by Dana, there is a statement that: "Initial Status Conference Date and Time: October 17, 2007 at 10:00 a.m." (R. 63, 68, 504)

When Jasco served its Response herein, it was serving a concise statement, on a preliminary basis, of the evidence that it anticipated presenting in response to a future summary judgment motion, if and when such a motion was served, but also explaining why discovery was necessary prior to the service of a summary judgment motion, in anticipation of a briefing schedule to be set by the Bankruptcy Court at the Initial Status Conference. Jasco did not, and

---

[4] In addition, Dana did not serve a Statement of Material Facts not in Dispute, as required by Southern District Local Civil Rule 56.1, as well as by Rule 7056-1(b) of the Local Rules of the Bankruptcy Court, with its "motion papers" either. After Jasco complained about this omission, the Bankruptcy Court ordered Dana to cure this deficiency by the belated service of a Rule 56.1 Statement, timed so as to preclude a meaningful response by Jasco.

had no reason to, serve its response to any summary judgment motion, because no summary judgment motion was pending.

At no time prior to the service of its Response was Jasco advised that Dana considered its Objection to be a motion for summary judgment and that it intended to ask the Bankruptcy Court to decide this purported summary judgment motion, on the merits, at the Initial Status Conference. Furthermore, the attempt by Dana to "convert" its Objection into a summary judgment motion violated the Claim Procedures adopted by the Bankruptcy Court in this proceeding by Order dated November 9, 2006, which provided: "No hearing will be initially set on any of the Tier III Objections, and all such Objections will first be set for a status and scheduling conference (the 'Initial Status Conference')." (R. 45) It also violated Local Rule 7056-1(a) of this Court, which provides that: "Unless the Court orders otherwise, no party shall file a motion for summary judgment without first seeking a pre-motion conference."

It was only during the required "meet and confer" conference with opposing counsel, held on September 28, 2007, one week *after* service of the Jasco Response, that Jasco was advised for the first time by opposing counsel that there was no need to discuss any scheduling, because Dana intended to "convert" its Objection into a summary judgment motion and to argue the motion on the merits the Initial Status Conference on October 17, 2007. (R. 549–550)

Despite Jasco's immediate, vigorous, and written protest to the Bankruptcy Court of this bait and switch procedure by Dana (R. 547–551), the Bankruptcy Court condoned Dana's "conversion" of its Objection, gave Dana an additional week to submit the required Rule 56.1 Statement, and ordered the parties to return in two weeks to argue the non-existent summary judgment motion. (R. 643–650) When counsel for Jasco requested an opportunity to respond to Dana's Rule 56.1 Statement, as provided for in Local Rule 56.1 and Local Bankruptcy Rule 7056-1, the Bankruptcy Court ordered Jasco to submit its response simultaneously with Dana's statement, thus making it impossible for Jasco actually to respond to Dana's statement. (R. 648–649) Furthermore, the Bankruptcy Court ordered Jasco to serve and file any cross-motions that it wished to bring and any additional summary judgment motion papers within one week, and it ordered that the "summary judgment motion" and any other motions would be argued on the merits two weeks after the Initial Status Conference. (R. 643–650)

- 18 -

In short, the Objection filed by Dana in this matter was not a motion for summary judgment, and it could not be unilaterally converted by Dana into such a motion, especially under circumstances which deprived Jasco of any meaningful opportunity to submit any responsive papers in opposition to such a summary judgment motion.

### Point II:  Bankruptcy Court Deprived Jasco of its Elementary Due Process Rights

During the Initial Status Conference, the Bankruptcy Court stated to Jasco's counsel: "Counselor, I will caution you.  One way or the other the merits of this matter are going to be decided, and they are going to be decided on an appropriate basis, not on a dilatory one. Keep that in mind." (R. 647) Thereupon, the Bankruptcy Court gave Dana an additional week to submit the required Rule 56.1 Statement, and ordered the parties to return in two weeks to argue the non-existent summary judgment motion. (R. 648–650)  When counsel for Jasco requested an opportunity to respond to Dana's Rule 56.1 Statement, as provided for in Local Rule 56.1 and Local Bankruptcy Rule 7056-1(c), the Bankruptcy Court ordered Jasco to submit its response simultaneously with Dana's statement, thus making it impossible for Jasco actually to respond to Dana's statement. (R. 648–650)

In short, the Bankruptcy Court made it clear that it had its mind made up at the Initial Status Conference; it condoned Dana's "conversion" of its Objection into a summary judgment motion, under circumstances which deprived Jasco of any meaningful opportunity to submit any responsive papers in opposition; and it failed to give any consideration to Jasco's arguments that additional discovery was required in this case (*see* Point III below) and that there were genuine issues of material fact precluding summary judgment in any event (*see* Point V below).  As a result, the Bankruptcy Court deprived Jasco of its elementary due process rights.

### Point III:  Dana's Summary Judgment Motion should have been Denied, because Discovery was Not Yet Complete

On December 27, 2005, prior to Dana's bankruptcy filing, Jasco served on opposing counsel, in the underlying state court action, Jasco's Third Notice to Produce to Defendant Dana. (R. 491–496)  This was a short, narrowly drafted, highly pertinent document demand.  Dana has never responded to this document demand.

Prior to the bankruptcy filing, counsel for Dana wrote a letter objecting to this demand (R. 498–500), labeling the demand "ridiculous" and "incomprehensible." In addition, counsel raised a number of transparently inadequate objections to the demand. For example, although counsel claimed that the demanded documents had been previously provided, counsel failed to identify either by Bates number or some other means, to which documents he was referring when claiming that the requested documents had been previously produced.[5] Counsel also objected that the documents were privileged, without providing a privilege log; he objected that the documents were irrelevant, despite the wide latitude given to discovery demands under both federal and state law; he objected that the demand was burdensome, despite the fact that only a handful of documents was being sought in an case involving a claim for more than $20 million. Before Jasco could move to compel, Dana's bankruptcy filing intervened, and the state court litigation was automatically stayed. (R. 361)

In addition, as was clear to both sides during the state court litigation, some additional limited discovery is required in the underlying action, such as the deposition of one or two additional Dana employees, before the case is ready either for a dispositive motion or a plenary trial, if necessary. (R. 361)

The Bankruptcy Court never looked at the pending document demand and never considered Jasco's need for additional discovery. Instead, the Bankruptcy Court simply quoted with approval from the unreported decision of the state court trial judge upon the summary judgment motion of another defendant in the underlying action, Gary Rogers, stating that: "The State Court found that Jasco's cry for additional discovery 'rings hollow' concluding that Jasco 'offers nothing but mere hope and speculation' that additional discovery would reveal evidence to prove the alleged conspiracy." (R. 21) The problem with this approach is that the state court trial judge was subsequently reversed by the Appellate Division of the New York Supreme Court, in a Decision which stated: "We conclude on this appeal that, because plaintiff [Jasco] established that discovery has yet to be completed, [New York] Supreme Court erred in granting

---

[5] Dana has produced a grand total of some 3,000 pages of documents in this $20 million lawsuit. To the best of Jasco's knowledge, none of the documents demanded in the pending document demand has ever been provided by Dana. For example, Jasco is not aware of the minutes of a single staff meeting provided by Dana; Jasco is not aware of a single page of a visitor log provided by Dana; Jasco is not aware of any documents reflecting a confidentiality policy provided by Dana; Jasco is not aware of any telephone records provided by Dana. It is simply not the case that the documents requested in Jasco's discovery demand were previously produced by Dana.

. . . Rogers summary judgment . . . [citations omitted].  Indeed, plaintiff established that it requires further document discovery and must depose or complete the depositions of additional witnesses. " *Jasco Tools, Inc. v. Rogers*, ___ A.D.2d ___, 844 N.Y.S.2d 810 (4th Dep't, Nov. 9, 2007).

Pursuant to Rule 56(f), if a party opposing a summary judgment motion cannot present facts essential to justify its opposition, the court may:  (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.

The Bankruptcy Court never reviewed Jasco's document demand, served prior to Dana's bankruptcy petition, and never considered Jasco's need for additional depositions.  In its Response, including the Baldino Declaration, Jasco had made a sufficient showing that facts essential to justify its opposition existed but could not be presented, because Dana had refused to disclose essential documents and testimony within its exclusive possession and control. (R. 359-361, 386)  The Bankruptcy Court should have denied Dana's summary judgment motion based on Rule 56(f) alone.  As the Second Circuit Court of Appeals has written:  "We also note that Fed.R.Civ.P. 56(f) states that when it appears from the affidavits of a party opposing a motion for summary judgment that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may either deny the summary judgment motion or 'order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.' This the district court did not do." *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995).  The Bankruptcy Court's failure to deny Dana's summary judgment motion on this ground was error.

### Point IV:  Dana Failed to Make Out a *Prima Facie* Entitlement to Summary Judgment

The party moving for summary judgment is required to make a *prima facie* showing of entitlement to summary judgment. "The burden of production imposed by Rule 56 requires the moving party to make a *prima facie* showing that it is entitled to summary judgment." *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 2557 (1986).

In this case, Dana did not submit an Affidavit, a Declaration, or any other sworn statement in support of its summary judgment motion. It did not submit any evidence in admissible form, and it did not make any showing to support the admissibility of the documents upon which it sought to rely.

The Objection filed by Dana is simply insufficient to make out a *prima facie* showing of entitlement to summary judgment. On this basis alone, and without regard to Jasco's Response to the Objection, Dana's motion for summary judgment should have been denied by the Bankruptcy Court.

### Point V: Dana's Summary Judgment Motion should have been Denied, because there were Genuine Issue of Material Fact raised by the Motion Papers

The standard applicable to summary judgment motions is clear in this Circuit. "Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505 (1986). *Dallas Aerospace, Inc. v. CIS Air Corp*., 352 F.3d 775, 780 (2nd Cir. 2003).

There are four different causes of action alleged against Dana in the underlying state court action. As will be shown below, Dana is not entitled to summary judgment with respect to any of these four causes of action. Of course, as long as any one cause of action survives Dana's summary judgment motion, the Dana's Objection must be dismissed.

### A. _Breach of Contract Cause of Action_

The first cause of action against Dana states a breach of contract claim, based on Dana's breach of a Purchase Agreement, dated as of July 21, 1995, between Dana's predecessor-in-interest and Jasco ("Purchase Agreement"). As conceded by Dana, the Purchase Agreement required that Dana engage in negotiations with Jasco for an extension of the term of the contract. (See par. 4.01 of the Purchase Agreement.)

It is Dana's position that this provision is merely "an agreement to agree," and that it did not impose any obligation upon Dana.

It is Jasco's position that this provision was not meaningless gibberish inserted in the contract simply to waste paper and ink, but rather, that it imposed upon the parties the affirmative duty to negotiate. Furthermore, as will be shown below, the law in both New York and Ohio implies a duty of good faith and fair dealing, which in this case means that the parties had an obligation to negotiate in good faith, regardless of what the ultimate outcome of those negotiations might have been.

In fact, as shown in the Baldino Declaration, Dana did not engage in any good faith negotiations with Jasco. On the contrary, Dana acted with the utmost of bad faith, in capitalizing on the theft of Jasco's trade secrets, in surreptitiously entering into an agreement with the competitor company which was utilizing the stolen trade secrets, in engaging in a charade of pretending to sit down to negotiate with Jasco after it had a deal in hand with the competitor, and in lying subsequently about what had occurred in sworn affidavits submitted to the state court. It is this failure to engage in good faith negotiations with Jasco that constitutes a breach of Dana's obligations pursuant to paragraph 4.01 of the Purchase Agreement.

The law on this question is the same in both New York and Ohio, and is ultimately based on the Restatement of Contracts 2nd, Section 2005. The law in New York, as summarized by District Judge Skretny in the Western District of New York, is as follows:

> Every contract contains an implied covenant of good faith and fair dealing. *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917); *see also Gelder Medical Group v. Webber*, 41 N.Y.2d 680, 363 N.E.2d 573, 394 N.Y.S.2d 867 (1977); *Van Valkenburgh, Nooger & Neville v. Hayden Publishing Co.*, 30 N.Y.2d 34, 281 N.E.2d 142, 330 N.Y.S.2d 329, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972); *Mutual Life Insurance Co. v. Tailored Woman*, 309 N.Y. 248, 128 N.E.2d 401 (1953). In other words, 'in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract....' *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933) (citations omitted). [O'Shanter Resources, Inc. v. Niagara Mohawk Power Corp., 915 F.Supp. 560, 568 (WDNY1996).]

Similarly, the New York Court of Appeals has held that:

Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance (*see, Van Valkenburgh, Nooger & Neville v. Hayden Publ. Co*., 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 281 N.E.2d 142, *cert denied* 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128).  Encompassed within the implied obligation of each promisor to exercise good faith are 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included' (*Rowe v. Great Atl. & Pac. Tea Co*., 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 385 N.E.2d 566, quoting 5 Williston, Contracts § 1293, at 3682 [rev ed 1937]). This embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract' ( *Kirke La Shelle Co. v. Armstrong Co*., 263 N.Y. 79, 87, 188 N.E. 163). [*Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 979 (1995).]

For a sampling of Ohio cases standing for the same proposition, see, for example, *Dunina v. Lifecare Hospitals of Dayton*, 2006 WL 1529475 (Ohio App. 2006); *DVCC, Inc. v. Medical College of Ohio*, 2006 WL 496036 (Ohio App. 2006); *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 462 (Ohio App. 2005); *Ritter v. Fairway Park Properties, LLC*, 2004 WL 1104015 (Ohio App. 2004); and *Concrete Designers, Inc. v. Demmler*, 1995 WL 765170 (Ohio App. 1995).

Case law is clear that courts are reluctant to conclude that the parties had nothing in mind when agreeing to a particular clause in a contract.  The Uniform Commercial Code reflects a similar presumption that the intent of the parties is to be enforced, rather than ignored.  The Second Circuit, summarizing the law in this area, has written:

In reaching this conclusion, we note that the cases discussed above are not the only New York precedents on the issue of missing contract terms. Under New York's implementation of the Uniform Commercial Code, there is a strong presumption that agreements are enforceable even if their price terms are not definite. N.Y. U.C.C. § 2-305 provides that:

The parties *if they so intend* can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if (a) nothing is said as to price; or (b) the price is left to be agreed by the parties and they fail to agree; or (c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

*A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.*

*Id*. (emphases added). The commentary to this section of New York's commercial code makes clear that "[t]his Article rejects *in these instances* the formula that 'an

agreement to agree is unenforceable' ... and rejects also defeating such agreements on the ground of 'indefiniteness.' Instead this Article recognizes the dominant intention of the parties to have the deal continue to be binding upon both." N.Y. U.C.C. § 2-305, Purposes of Changes, cmt. 1 (emphasis added). See also N.Y. U.C.C. § 2-204(3) ("Even though *138 one or more terms are left open a contract for sale [of goods] does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."). [Arbitron, Inc. v. Tralyn Broadcasting, Inc., 400 F.3d 130, 137-38 (2nd Cir. 2005).]

The New York Court of Appeals has been similarly reluctant simply to throw out contractual provisions. For example, in a case involving a contractual renewal provision that did not include any specific terms, the Court wrote as follows: "We think that plaintiff should have the opportunity of exploring before a jury the whole question of the meaning of this long series of writings and long course of dealings. We do not think that our search for the meaning of this renewal clause comes to a full stop as soon as the phrase 'mutually agreed upon' is encountered." *May Metropolitan Corporation v. May Oil Burner Corporation*, 290 N.Y. 260, 264, 265, 49 N.E.2d 13, 15-16 (1943).

Summarizing the law in this area, the Second Circuit has recently written:

"[A] contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement." *May Metro. Corp. v. May Oil Burner Corp.*, 290 N.Y. 260, 264, 49 N.E.2d 13 (1943). "[A]t some point virtually every agreement can be said to have a degree of indefiniteness," but "parties ... should be held to their promises." *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483, 548 N.Y.S.2d 920, 548 N.E.2d 203 (1989). [*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc*., 487 F.3d 89, 95 (2nd Cir. 2007).]

As stated by both the Second Circuit Court of Appeals and the New York Court of Appeals, "parties ... should be held to their promises." In this case, Dana promised to negotiate in good faith, and it did not do so. Evidence obtained in the state court action shows that Dana, fully cognizant of the fact that a competitor of Jasco's had stolen Jasco's trade secrets, conspired with representatives of the competitor to negotiate a contract based on the use of these stolen trade secrets. Only after Dana had completed its negotiations with the competitor, did Dana sit down with Jasco for its alleged "good faith negotiations."

Specifically, as shown in the Baldino Declaration: (1) Dana purchasing people, Adam Haybach and Bob Buss, were having telephone discussion with representatives of the competitor, Nationwide Precision Products Corp. ("Nationwide"), in June, July, and August, 1999; (2) Nationwide learned that it had "an opportunity" at Dana in August of 1999; (3) on September 39, 1999, Haybach told Buss to "pull a print/quote package for all Jasco parts"; (4) Dana employees had dinner with Nationwide employees in Rochester, New York, on October 19, 1999; (5) Dana employees visited the Nationwide facility in Rochester, New York, on October 20, 1999; (6) Dana employees had dinner with Nationwide employees in Kalamazoo, Michigan, on November 9, 1999; (7) Nationwide employees made a formal presentation to Dana employees, complete with PowerPoint slides, at the Dana offices in Kalamazoo, Michigan, on November 10, 1999; and (8) Dana had in hand a detailed written quote from Nationwide on November 26, 1999. All of this occurred before Dana sat down, on December 3, 1999, for its "good faith negotiations" with Jasco.

This entire chronology is demonstrated by documents obtained by Jasco in the course of discovery in the state court action. Before these documents were obtained by Jasco, employees of Dana submitted affidavits in the state court, stating under oath that it was only *after* the "negotiations" with Jasco had broken down, and *because* the "negotiations" had broken down, that Dana started the process of seeking competing bids for the work. The unverified Objection submitted herein continues to recite this inaccurate and deceptive chronology.[6]

The failure of Dana to negotiate in good faith with Jasco, as required by paragraph 4.01 of the Purchase Agreement and the applicable law, constitutes a breach of contract. At a minimum, there are genuine issues of material fact concerning Dana's alleged breach of contract which require denial of Dana's motion for summary judgment upon this cause of action.

---

[6] It may well be that the reason Dana is so desperate to avoid disclosing the requested documents is that these documents further corroborate the documents obtained from Nationwide in showing the chronology of events and in showing that Dana failed to act in good faith with respect to its contract obligations to Jasco.

B.  *Conversion Cause of Action*

The second cause of action against Dana (the Fourth Cause of Action in the complaint) alleges a conversion claim against Dana, based on misappropriation of business confidential and trade secret information belonging to Jasco.

As shown in the Baldino Declaration, there is no doubt that Nationwide employees stole Jasco's trade secrets; that the management of Nationwide, all the way up to the President and the Board of Directors, knew that they had stolen Jasco's trade secrets; and that Nationwide utilized these stolen trade secrets in obtaining a contract from Dana for the work previously performed by Jasco.  Dana does not really dispute this much.[7]  Dana's real argument is that Dana's purchasing people did not realize that Nationwide was using stolen data, or that Dana was receiving the benefit of this stolen data in the form of a ten percent discount in the contract price.  However, Dana's argument is contradicted by the written evidence attached to the Baldino Declaration, including the PowerPoint presentation that Nationwide made to Dana on November 10, 1999.  In this presentation, Nationwide explicitly bragged about the information that its newly acquired employees (formerly employed by Jasco) had stolen from Jasco.  In addition, in the quote submitted by Nationwide to Dana on November 26, 1999, Nationwide managed to undercut the prices that Jasco intended to charge Dana in 2000 by exactly ten percent on each one of some 130 different parts.  Based on this bid, Dana knew, or should have known, two things:  (1) that Nationwide had stolen from Jasco, and was using for its own purposes, information showing how much Jasco intended to charge Dana for every part during the following year, which information was proprietary; and (2) that Nationwide, without the benefit of any learning curve, was managing to charge less for the parts than Jasco, which had the benefit of a five-year learning curve, something that would not have been possible unless Nationwide had stolen the fruits of the learning curve from Jasco.  Third, Dana employees have consistently lied, under oath, about the chronology of events in this case, about the phone calls that they have received from their co-conspirators, and about their reasons for taking the actions that they have taken in this case.  It is respectfully submitted that an adverse inference should be drawn against Dana based on the conduct of its employees.

---

[7] Counsel for Dana did include a footnote in the Objection (footnote 4), in which he claims that these trade secrets were of "questionable relevance."  A footnote, in an unverified pleading, by an attorney with no personal knowledge, is a poor way to make a factual showing in support of a summary judgment motion.

The New York Court of Appeals has recently set forth the elements of a conversion cause of action:

> A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession (*State of New York v. Seventh Regiment Fund*, 98 N.Y.2d 249, 746 N.Y.S.2d 637, 774 N.E.2d 702 [2002] ). Two key elements of conversion are (1) plaintiff's possessory right or interest in the property (*Pierpoint v. Hoyt*, 260 N.Y. 26, 182 N.E. 235 [1932]; *Seventh Regiment Fund*, 98 N.Y.2d at 259, 746 N.Y.S.2d 637, 774 N.E.2d 702) and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights (*Employers' Fire Ins. Co. v. Cotten*, 245 N.Y. 102, 156 N.E. 629 [1927]; *see also* **Restatement [Second] of Torts** §§ 8A, 223, 243; **Prosser and Keeton, Torts** § 15, at 92, 102 [5th ed.] ). [*Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50, 860 N.E.2d 713 (2006).]

Assuming that the facts, as set forth in the Baldino Declaration and in the Exhibits annexed thereto, are true, and drawing all inferences favorable to Jasco from these facts, there is no doubt that Jasco has alleged a valid cause of action for conversion against Dana. Dana and Nationwide jointly, intentionally, and without authority usurped trade secrets and business confidential information belonging to Jasco for their own benefit, and they interfered with Jasco's right to use these trade secrets and business confidential information for its own benefit.

Accordingly, it is respectfully submitted that Jasco has demonstrated its entitlement to a judgment against Dana for conversion. At a minimum, the facts set forth in the Baldino Declaration and in the Exhibits annexed thereto raise genuine issues of material fact concerning Dana's conversion, which require denial of Dana's motion for summary judgment upon this cause of action.

C. _Unjust Enrichment Cause of Action_

The third cause of action against Dana (the Fifth Cause of Action in the complaint) alleges that Dana has been unjustly enriched in this case.

The elements of an unjust enrichment cause of action have been set forth by the New York Court of Appeals as follows:

The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered (*Grombach Prods. v. Waring*, 293 N.Y. 609, 615, 59 N.E.2d 425, 428; *American Sur. Co. v. Conner*, 251 N.Y. 1, 8-11, 166 N.E. 783, 785-787; *Miller v. Schloss*, 218 N.Y. 400, 407, 113 N.E. 337, 339; *Schank v. Schuchman*, 212 N.Y. 352, 106 N.E. 127; **Restatement, Restitution**, §1; 50 **N.Y.Jur., Restitution**, §§ 1, 3). [*Paramount Film Distributing Corp. v. State of New York*, 30 N.Y.2d 415, 421, 285 N.E.2d 695, 698 (1972), *cert. denied* 414 U.S. 829, 94 S.Ct. 57.]

Certainly, equity and good conscience would indicate that Dana should not be allowed to retain its share of the "spoils" of the theft of Jasco's trade secrets.  Given the fact that Jasco, which was best positioned to provide the parts in question at the lowest possible cost, having geared up its equipment and facilities and having developed its knowledge base and skill over the previous five years, needed a 3% to 5% increase for the renewal term of the contract, and given the fact that Dana managed to obtained the parts in question for 10% less than what Jasco intended to charge in 2000, which savings were the result of the theft of Jasco's trade secrets by Nationwide's employees, it seems fairly clear that Dana was unjustly enriched at the expense of Jasco.

Accordingly, it is respectfully submitted that Jasco has demonstrated its entitlement to a judgment against Dana for unjust enrichment.  At a minimum, there is a genuine issue of material fact concerning Dana's unjust enrichment, which requires denial of Dana's motion for summary judgment upon this cause of action.

### D.  Prima Facie *Tort Cause of Action*

The fourth and final cause of action against Dana (the Sixth Cause of Action in the complaint) states a claim for *prima facie* tort.

The New York Court of Appeals has set forth the elements of a *prima facie* tort cause of action as follows:

Some years ago this court recognized the general principle that harm intentionally inflicted is *prima facie* actionable unless justified (*see Advance Music Corp. v. American Tobacco Co.*, 296 N.Y. 79, 70 N.E.2d 401; *American Guild of Musical Artists v. Petrillo*, 286 N.Y. 226, 36 N.E.2d 123; Opera on Tour v. Weber, 285 N.Y. 348, 34 N.E.2d 349, *cert. den.* 314 U.S. 615, 62 S.Ct. 96, 86 L.Ed. 495).

That principle has developed into the specific cause of action of *prima facie* tort consisting of four elements: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful (*Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 332, 464 N.Y.S.2d 712, 451 N.E.2d 459; *ATI, Inc. v. Ruder & Finn*, 42 N.Y.2d 454, 458, 398 N.Y.S.2d 864, 368 N.E.2d 1230). [*Curiano v. Suozzi*, 63 N.Y.2d 113, 117, 469 N.E.2d 1324, 1327 (1984).]

The facts set forth in the Baldino Declaration and in the Exhibits annexed thereto, and all of the inferences that may be drawn from these facts in favor of Jasco, demonstrate each element of a *prima facie* tort cause of action. Specifically, there can be no doubt: (1) that employees of Dana and Nationwide conspired, knowingly, intentionally, and wrongfully, to deprive Jasco of its contract with Dana when they worked together, over several months, to steal trade secrets and business confidential information belonging to Jasco, to use these trade secrets and information to obtain prices for Dana that could not have been obtained lawfully, to then lie about what they had done, in order to mislead Jasco and the state court; (2) that these actions resulted in special damages to Jasco, because Jasco lost a profitable contract that would have generated more than $20 million of profit over the life of the contract, but for the actions of the defendants; (3) that there was no lawful excuse or justification for the actions of Dana and Nationwide, the desire to profit from the theft of another's property not being an acceptable excuse or justification; and (4) that had Dana simply gone about the business of obtaining the lowest available bid for its work, without engaging in wrongful activity, its actions would have been entirely lawful.

Accordingly, it is respectfully submitted that Jasco has demonstrated its entitlement to a judgment against Dana for *prima facie* tort. At a minimum, the facts raise genuine issues of material fact concerning Dana's actions which require denial of Dana's motion for summary judgment upon this cause of action.

**CONCLUSION**

Based on all of the foregoing reasons, Jasco respectfully requests that:  (1) Dana's Objection to Jasco's Claim be dismissed; and (2) Jasco's Claim be allowed in an amount to be determined by the state court.

Dated:  December 27, 2007

                                        Respectfully submitted,


                                        s/Alexander Geiger
                                        Alexander Geiger, Esq. (AG-8974)
                                        GEIGER and ROTHENBERG, LLP
                                        45 Exchange Street, Suite 800
                                        Rochester, NY  14614
                                        Tel.:  (585) 232-1946
                                        Fax:  (585) 232-4746

                                        *Attorneys for Jasco Tools, Inc.*